STATE, Plaintiff-Respondent, v. EHLENFELDT, Defendant-Appellant.

Supreme Court

*No. 77–306–CR. Submitted on briefs January 9, 1980.—Decided March 4, 1980.*
(Also reported in 288 N.W.2d 786.)

348

For the appellant the cause was submitted on the brief of *Frank C. Lisheron, Jr.,* and *Lisheron Law Offices* of Princeton.

For the respondent the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Betty R. Brown,* assistant attorney general.

BEILFUSS, C.J. The defendant George Ehlenfeldt appeals his conviction on two counts of aiding and abetting the violation of sec. 95.28(1), Stats., which prohibits the dismemberment or storage of meat from a diseased animal at premises where other food is sold or prepared for sale. Ehlenfeldt was tried by a jury on an information containing three counts of the offense; guilty verdicts were returned as to two. Judgment was entered on the verdict and fines of $2,000 and $1,000, respectively, were imposed for the separate violations.[1]

The charges originally grew out of a John Doe investigation into Dan's Country Boy Market, a retail grocery store, meat market and slaughter plant located in Green Lake County. Ehlenfeldt was found to have intentionally delivered two diseased bovine animals for dismemberment and storage to Dan's Country Boy Market on a Friday in either February or March of 1976, and to have intentionally delivered another diseased bovine animal for dismemberment and storage on October 16, 1976.

The evidence presented at trial revealed that Ehlenfeldt was a licensed livestock dealer of some thirty years' experience who regularly did business with Dan's Country Boy Market. On one particular Friday in either February or March of 1976 he purchased eleven or twelve

---

[1] The possible penalties for violating sec. 95.28, Stats., are set out by sec. 95.69(2) as follows:

"(2) Whoever violates s. 95.28 or 95.29 may be fined not less than $500 nor more than $5000, or imprisoned not more than 5 years, or both."

cows at Midwest Livestock Producers, an auction market in Lomira, Wisconsin. He instructed John Long, who was employed as a truck driver and handyman at his farm stockyards, to load the animals onto his truck and deliver all but two of them to his farm. The two remaining cows were to be taken to Dan's Country Boy Market for slaughter and processing.

Long testified that the two cows Ehlenfeldt had instructed him to deliver to Country Boy were skinny and that it took awhile to load them because they were slow. After loading the animals onto the truck, he left Lomira at about 6 p.m. and arrived at Ehlenfeldt's stockyards at about 7:45 p.m. When he arrived at the stockyards, he noticed that the two cows slated for slaughter were down and could not get up. He prodded the animals with a "hot rod," *i.e.*, an electrical device which shocks an animal, but they remained down. Despite their condition, however, Long delivered these two cows to Country Boy immediately after he finished unloading the other animals. He testified he did so because Ehlenfeldt had ordered him to take them there no matter what their shape was.

Dale Keach, an employee of Country Boy, testified that at about 7:30 p.m. on a Friday in either February or March of 1976 he received a telephone call at work from Danny Weinberger, the proprietor of Dan's Country Boy Market. Weinberger told him to get ready because two beef were coming in from Ehlenfeldt's stockyards. Keach stated that he and Larry Fitzgerald, another employee of Country Boy were instructed to go back and slaughter the animals when they arrived.

At about 8 p.m., Keach testified, John Long pulled into the back of the market with the two cows. The animals were down and breathing heavily. Despite their again being prodded with a "hot rod," they were still unable to move. Keach and Long then placed a chain around each

animal's neck and, using the hoist from the slaughter-house, dragged them out of the truck and into the building. After the animals were unloaded, Long left and Keach and Fitzgerald went to work slaughtering them.

Keach testified that when he got the animals into the building their breathing was still very heavy, and when he shot and stuck them, their reaction was unlike that of other animals he had slaughtered. He stated that a normal animal reacted by kicking violently and that its blood flowed freely. These animals, however, moved very little and their blood was very coagulated. Keach also testified that upon skinning the animals out he noticed that their odor was unlike that of other animals he had butchered and their meat showed signs of possible infection.

After they were skinned out, the animals were then quartered, washed and hung up. They were marked "George Ehlenfeldt—not for sale," and placed in the cooler.

Keach testified that the next morning he told Weinberger about the bad condition of the cows they had received from Ehlenfeldt but that Weinberger simply turned and walked away without saying anything.

The following week the meat was boned out and placed in tubs marked "George Ehlenfeldt—not for sale." It was subsequently weighed out, pork was added, and it was put through the grinder twice. Keach testified that this meat was later ground a third time, stuffed into sausage and then sold over the counter as "Country Boy Summer Sausage—retail."

When asked why he had done this with the two apparently sick animals, Keach responded that this was the general procedure for all of these animals that come in from Ehlenfeldt's stockyards and that he had been instructed to do so by Mr. Weinberger. The defendant

George Ehlenfeldt never received any of the meat from these two animals.

On October 15, 1976, Ehlenfeldt bought another animal—this time a black steer—at Midwest Livestock Producers. Long testified that this animal was also sick when he loaded it onto the truck and transported it to Ehlenfeldt's farm. He stated that Ehlenfeldt instructed him to give the animal 20 cc's of penicillin when he got it home.

The next morning when he saw the animal, Long testified, the steer was laying in the yard and couldn't get up. He then called a veterinarian, Dr. Allen Lippart.

Dr. Lippart examined the animal around noon on October 16, 1976. He testified that when he arrived the animal was "rather alert, looking around." He and Long tried to get it up but were unsuccessful. The steer's temperature was higher than normal, and Dr. Lippart noted that it was bleeding in the rectal area, its heart rate was a little fast and its bladder contained about a gallon of urine. He made no specific diagnosis at that time but gave the animal several antibiotics and 500 cc's of dextrose. Dr. Lippart stated that his prognosis for the animal was "poor to guarded."

The steer was still down when Long left at about 5 p.m. Long testified that Ehlenfeldt told him he would be out in the yard that evening at 6 p.m., and that he should return then. When Long returned the steer was still down and Ehlenfeldt and Larry Fitzgerald from Country Boy were in the yard. Ehlenfeldt was carrying a butcher knife. Long was instructed to go get a tractor, and when he returned the steer's throat had been cut. The animal was then loaded onto Country Boy's truck and hauled away by Fitzgerald.

According to Fitzgerald's testimony, he took the carcass to Dan's Country Boy Market where he butchered it and placed it in the cooler marked "Not inspected—not

for sale—George Ehlenfeldt." He testified that he did not know whether or not Ehlenfeldt ever received this meat or what happened to it.

Ehlenfeldt testified on his own behalf denying that he had intentionally delivered or caused to be delivered to Dan's Country Boy Market for dismemberment and storage any diseased animals. With respect to the two animals delivered in February or March of 1976, he stated that Weinberger had informed him that he needed boning canners and for this reason he purchased the two additional cows from Midwest. He stated that the animals were standing when he bought them and that after that time he neither saw nor heard anything about them again.

Regarding the black steer, Ehlenfeldt testified that he believed the animal's back had been broken when it was placed in a pen with several bulls. He denied that he had instructed Long to administer penicillin to the animal after he had purchased it at the auction market. He admitted that Dr. Lippart was called to examine the steer, but stated that he was never informed of the doctor's opinion as to the animal's condition or that drugs had been administered to it. Ehlenfeldt further testified that the steer was finally slaughtered for his own use and that, when he discovered that it had been injected with drugs, he fed the meat to his dogs.

On appeal Ehlenfeldt raises two primary issues:

(1) Is sec. 95.28(1), Stats., unconstitutionally vague?

(2) Are the jury's verdicts sufficiently supported by the evidence?

Sec. 95.28(1), Stats., reads as follows:

"95.28 **Meat from dead or diseased animals.** (1) No meat from any diseased animal, or any animal that has died other than by slaughter, shall be sold or used for human consumption, or dismembered or stored at premises where other food is sold or prepared for sale."

Ehlenfeldt contends that this section is unconstitutionally vague because it fails to give reasonable notice of the conduct it proscribes. He claims that the failure of the legislature to define the phrase "diseased animal" as it is used in the statute renders it so obscure that a person of ordinary intelligence must necessarily guess as to its applicability.

The constitutional foundation of the vagueness challenged to a penal statute is the procedural due process requirement of fair notice. *Butala v. State,* 71 Wis.2d 569, 573, 239 N.W.2d 32 (1976). A statute must at least be sufficiently definite to permit one inclined to obey it, even if for no other reason than to avoid its penalties, to reasonably understand what conduct is prohibited and what is allowed. It should also be sufficiently definite to allow a judge or jury to objectively apply its terms to the conduct of a defendant in order to determine his guilt or innocence without having to create or apply standards of their own. *State v. Courtney,* 74 Wis.2d 705, 711, 247 N.W.2d 714 (1976). " 'If the statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its applicability, it is unconstitutional.' " *State v. Zwicker,* 41 Wis.2d 497, 507, 164 N.W.2d 512 (1969), appeal dismissed 396 U.S. 26.

Of course it is neither necessary, nor possible, that a statute define the boundaries of the conduct which it seeks to proscribe with mathematical precision. A certain amount of vagueness and indefiniteness is inherent in all language and, if not permitted, nearly all penal statutes would be void. Thus, we have said, " 'Not every indefiniteness or vagueness is fatal to a criminal statute. . . . A fair degree of definiteness is all that is required.' " *State v. Courtney, supra,* 74 Wis.2d at 710, quoting *Ministers Life & Casualty Union v. Haase,* 30 Wis.2d 339,

362, 141 N.W.2d 287 (1966), appeal dismissed, 385 U.S. 205.

Nor is it necessary in order to achieve the constitutionally required degree of precision that the legislature specifically define each and every term contained in a penal statute. Our laws are written in a common language having meaning and significance apart from and independent of the legislature's use of it. In the absence of a statutory definition, this common and approved usage of nontechnical words and phrases contained in statutes is presumed to be the usage intended by the legislature. Sec. 990.01(1), Stats. This meaning, we have said, may be established by using the dictionary definition. *Cheatham v. State,* 85 Wis.2d 112, 123, 270 N.W.2d 194 (1978).

With respect to sec. 95.28(1), Stats., we find the language sufficiently clear and definite to permit one inclined to obey to understand what conduct is prohibited. In truth, this section is but a statutory expression of the common sense idea that meat from diseased animals is generally unfit for human consumption and should be kept completely separate from the meat of healthy animals which is intended to be sold for human consumption. The legislature's failure to include in the statute a definition of the phrase "diseased animal," rather than rendering the statute unconstitutionally vague, means only that those words are to be understood according to their plain everyday meaning.

The word "disease" is not so difficult or incomprehensible that a person of ordinary intelligence would be unaware of its meaning. It is commonly thought of as meaning sickness. Webster's New World Dictionary (1974) defines "disease" as "any departure from health; illness in general." The definition contained in Webster's Third New International Dictionary (1964), while more detailed, is to the same effect. It defines "disease"

as: "an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors (as malnutrition, industrial hazards, or climate), to specific infective agents (as worms, bacteria, or viruses), to inherent defects of the organism (as various genetic anomalies), or to combinations of these factors: SICKNESS, ILLNESS."

Although in certain cases it may be difficult to determine whether or not a particular animal is diseased, the question that would arise in such cases is not whether the terms of the statute are sufficiently definite, but whether the evidence is of sufficient weight to establish that the defendant's conduct fell within its terms. That is the only real question Ehlenfeldt raises here. We have no doubt that sec. 95.28(1), Stats., sufficiently outlines the conduct the legislature sought to prohibit such that one bent on obedience is able to discern when the region of proscribed conduct is neared. *State v. Courtney, supra,* 74 Wis.2d at 711. We turn therefore to Ehlenfeldt's contention that the evidence presented at trial was insufficient to establish that his conduct invaded that region.

In order to obtain a conviction, the state is required to prove every essential element of the crime charged beyond a reasonable doubt. *Bautista v. State,* 53 Wis.2d 218, 223, 191 N.W.2d 725 (1971). The substantive offense with which Ehlenfeldt was charged as a party to a crime was the violation of sec. 95.28(1), Stats. As charged here, that offense consists of two essential elements: (1) the dismemberment or storage of meat from a diseased animal, (2) at a premises where other food is sold or prepared for sale.[2]

---

[2] This element of the offense is not in question. The parties stipulated to the fact that Dan's Country Boy Market is a place where food is sold and prepared for sale.

When, however, the diseased animal is slaughtered in an establishment where meat inspection is maintained under sec. 97.42, Stats., or the federal meat inspection act, sub. (3) of sec. 95.28 requires proof of the additional fact that the disease from which the animal suffered is one which would ordinarily render its meat unfit for human consumption.

Sec. 95.28 (3), Stats., provides:

"(3) Subsection (1) shall not apply to meat from animals affected by any disease which does not ordinarily render such meat unfit for human consumption, provided the animals so affected have been slaughtered in establishments where meat inspection is maintained under s. 97.42 or the federal meat inspection act."

Apparently, the fact that an animal is diseased does not necessarily render its meat unfit for human consumption. Sec. 97.42, Stats., entitled "Compulsory inspection of animals, poultry and carcasses," requires the examination by Wisconsin Department of Agriculture meat inspectors of all animals and poultry before, and their carcasses after, any slaughtering which is performed at licensed establishments.[3] The department of agriculture, pursuant to authority granted it under sec. 97.42 (4), Stats., has enacted detailed regulations governing the pre- and post-slaughter inspection of animals slaughtered and processed at these establishments. *See* 1 Wis. Adm. Code, sec. AG 47. The obvious intent of sec. 97.42 and the department regulations is to require careful scrutiny of the slaughtering process by department of agriculture meat inspectors so as to prevent the sale and use of meat products which are unwholesome or otherwise unfit for human food. Sec. 97.42 (3).

---

[3] Sec. 97.42 (3) (d), Stats., specifically excludes from the inspection requirement "animals and poultry slaughtered as a custom service for the owner exclusively for use by him and members of his household and nonpaying guests and employes."

By creating in sec. 95.28(3), Stats., an exception to the general prohibition of sec. 95.28(1) against the dismemberment and storage of the meat of diseased animals at premises where other food is sold or prepared for sale, the legislature apparently felt that the mandatory inspection requirements which apply to licensed establishments would be sufficient to protect the public from the danger of unwholesome meat products. Thus, with respect to animals slaughtered at such establishments, no violation of sec. 95.28(1) occurs unless such animals are not only diseased, but the disease from which they suffer is one which ordinarily renders meat unfit for human consumption.

In addition, although intent does not appear to be an element of the substantive offense involved here, it is an element of the specific crimes with which Ehlenfeldt has been charged by virtue of sec. 939.05, Stats., the general party to a crime statute. Ehlenfeldt was charged and convicted of intentionally aiding and abetting Dan's Country Boy Market in the violation of sec. 95.28(1). In *Hawpetoss v. State,* 52 Wis.2d 71, 78, 187 N.W.2d 823 (1971), we stated:

"The elements of complicity, or aiding and abetting are that a person (1) undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further (2) he consciously desires or intends that his conduct will yield such assistance."

It clearly follows from the above that Ehlenfeldt's conviction can only be sustained if he was shown to have intentionally undertaken conduct which as a matter of objective fact aided Dan's Country Boy Market in violating sec. 95.28(1), Stats. Moreover, because the two cows purchased by Ehlenfeldt in February or March of 1976 were slaughtered at Country Boy, an establishment in

which inspection is maintained under sec. 97.42, instead of on the farm as was the black steer, the state was also required to prove that these animals suffered from a disease which rendered their meat unfit for human consumption.

The question to be decided then is whether the state has met its burden in proving these elements. In making this determination, we do not sit as a judge or jury making findings of fact. Such findings have already been made, in this case by a jury, and our function in reviewing those findings is simply to decide "whether the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the defendants' guilt beyond a reasonable doubt." *Lock v. State,* 31 Wis.2d 110, 114, 142 N.W.2d 183 (1966). As we have frequently observed, " '. . . The test is not whether this court is convinced of the guilt of the defendant beyond a reasonable doubt but whether this court can conclude the trier of facts could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true.' " Id. at 114–115; *Krueger v. State,* 84 Wis.2d 272, 282–83, 267 N.W.2d 602 (1978).

Applying that test here, first, to Ehlenfeldt's conviction under Count 2 involving the delivery of the black steer to Dan's Country Boy Market on October 16 of 1976, we believe the evidence was sufficient to support the jury's finding of guilt. That this animal was diseased was apparent from the testimony of Long and Dr. Lippart. The animal was down and unable to get up. Its temperature was higher than normal and there was bleeding around the rectal area. Dr. Lippart testified that he injected several different antibiotics into the animal and viewed its chances of survival at about 50/50. Ehlenfeldt's delivery of the steer's carcass to Fitzgerald

for dismemberment and storage at Country Boy was clearly conduct which as a matter of objective fact aided that establishment in the violation of sec. 95.28(1), Stats.

The evidence also reveals that Ehlenfeldt intended his conduct to yield such assistance. Although intent is usually not susceptible of direct proof, it may often be inferred from a person's voluntary acts because of the almost self-evident principle of human conduct that people normally intend the natural and probable consequences of their acts. *Johnson v. State*, 85 Wis.2d 22, 32, 270 N.W.2d 153 (1978). Of course, if Ehlenfeldt was unaware that his steer was diseased, no inference of intent could be drawn. He could not have intended to have meat from a diseased animal stored at a premises where other food is sold or prepared for sale, if he didn't know the animal was diseased.

In this case, however, we feel there was sufficient evidence for the jury to conclude that Ehlenfeldt knew the steer was diseased. Immediately after he purchased the animal, Ehlenfeldt ordered Long to give it 20 cc's of penicillin when he arrived with it back at the stockyards. The next day when the animal was down and unable to get up, Ehlenfeldt had a veterinarian examine it. Although he denied that Dr. Lippart ever told him personally what was wrong with the animal, Ehlenfeldt must have realized its condition was unimproved because it was still down that evening. Despite the diseased condition of the animal, however, Ehlenfeldt slaughtered the animal on his farm that evening and had the carcass taken to Country Boy for dismemberment and storage. Based upon this evidence we believe that a jury, acting reasonably, could conclude beyond a reasonable doubt that Ehlenfeldt intentionally aided and abetted the violation of sec. 95.28(1), Stats.

It is with respect to the two cows delivered to Country Boy in February or March of 1976, however, that we have serious difficulty in upholding the jury's verdict. As noted above, these animals were not only dismembered and stored at Dan's Country Boy Market, but were also slaughtered there. Thus, the state was required to prove the additional element that the disease from which they were suffering was one which would ordinarily render their meat unfit.

In addition, the state was required to establish that Ehlenfeldt knew the animals were suffering from such a disease but nevertheless delivered them to Country Boy for dismemberment and storage there. It is simply not enough that he delivered diseased animals to a licensed establishment for slaughter. In fact, under department of agriculture regulations governing livestock deals and markets, a licensed slaughtering establishment is one of the few places where diseased livestock can be lawfully delivered. 1 Wis. Adm. Code, sec. AG 11.02 (5) provides:

"AG 11.02 **Unlawful conduct.** It shall be unlawful for any dealer or operator of a livestock market:

" . . .

"(5) To knowingly and wilfully sell or deliver, or to cause the sale or delivery of diseased livestock to any person *other than a slaughtering establishment* or public stockyards authorized by law to receive diseased livestock, except upon written authorization of the department." (Emphasis added.)

The whole statutory and regulatory scheme governing licensed slaughtering establishments assumes that diseased animals will be received by them and relies upon the inspection procedures required at such establishments to insure that unwholesome meat and meat products are identified and destroyed. It therefore cannot be a crime for a livestock dealer to deliver cattle suspected of being diseased where he also intends to rely upon those inspection procedures.

Of course, where such a dealer knows his cattle suffer from a disease which would ordinarily render their meat unfit for human consumption and delivers them to a slaughtering establishment seeking to avoid the inspection procedure required by law, he does intentionally aid and abet the violation of sec. 95.28(1), Stats. Here, however, the evidence is simply insufficient to establish that Ehlenfeldt acted with such knowledge and intent.

The evidence presented by the state on Count 1 revealed that Ehlenfeldt purchased the two cows at an auction market only several hours before they were slaughtered. When he purchased them they were on their feet and walking. John Long described the cows at the time he picked them up in Ehlenfeldt's truck as being skinny and slow. From this the state would have us conclude that the jury could have inferred that Ehlenfeldt, a livestock dealer with thirty years' experience, knew the animals were diseased at that time.

Even assuming the state's contention is correct, however, there is still no evidence that Ehlenfeldt knew that the meat from these animals would be unwholesome. Although it may be possible for a jury to reasonably conclude on the basis of Long's and Keach's descriptions of the animals that they were unfit for human consumption, those descriptions were based upon observations of the cows made after Long had loaded them onto the truck and they were on their way to the slaughterhouse. There is no evidence that Ehlenfeldt personally had any knowledge of the condition of the animals after he purchased them. In fact, both Long and Keach specifically denied that they had ever informed him of their condition. Without such knowledge it simply cannot be said that Ehlenfeldt, by delivering those animals, intentionally aided and abetted Country Boy in violating sec. 95.28(1), Stats., beyond any reasonable doubt.

It follows that the judgment of conviction as to Count 1 must be reversed and the information as to that count dismissed; the judgment as to Count 2 should be affirmed.

*By the Court.*—Judgment affirmed in part and reversed in part.