STATE of Missouri, Respondent,

v.

Barry J. HOLCOMB, Appellant.

Nos. WD 51077, WD 53028.

Missouri Court of Appeals,
Western District.

Submitted June 23, 1997.

Decided Sept. 9, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 28, 1997.

Application to Transfer Denied
Dec. 23, 1997.

Robert G. Duncan, William E. Shull, Liberty, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before BERREY, P.J., and SMART and EDWIN H. SMITH, JJ.

SMART, Judge.

After a jury trial, Barry J. Holcomb was found guilty of murdering Laura Vaughn and her unborn infant son. He was sentenced to two consecutive life sentences without the possibility of probation or parole. Holcomb is appealing his convictions of first degree murder. He also appeals the denial of his Rule 29.15 motion for post-conviction relief. Holcomb contends: (1) the trial court erred in overruling and denying his motion to dismiss Count II, the murder of the unborn infant, because, he says, an unborn child is not a person; (2) the trial court erred in refusing and failing to submit instruction on murder in the second degree; (3) trial counsel was ineffective for failing to submit lesser included offense instructions; (4) counsel was ineffective in allowing Holcomb to testify; and (5) the trial court should have declared a mistrial following a comment it made to defense counsel because such remark was an improper comment on the evidence. The judgment of the trial court is affirmed. The judgment of the motion court is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

During the months of January and February, 1994, Laura Vaughn called the police to her home several times to report that Barry Holcomb, her boyfriend, had physically assaulted her. She told the police that Holcomb had threatened to kill her and her unborn child. One of Ms. Vaughn's friends, Penny Morgan, observed bruises on Ms. Vaughn's neck, face and arms. Ms. Vaughn told Ms. Morgan that Holcomb had thrown her in the fireplace.

On the evening of June 26, 1994, Ms. Vaughn took her daughter to the home of Margaret Chrisman, Ms. Vaughn's sister-in-law. Holcomb accompanied her. Ms. Vaughn told Ms. Chrisman that she and Holcomb were going to go fishing and that she would pick her daughter up the following day at about 2:00 p.m. Around 2:45 a.m., the next morning, a neighbor of Ms. Vaughn's heard a car door slam twice, the second time louder than the first. The car raced down the street with a loud-sounding motor. Ms. Vaughn's car had a loud muffler and a driver's side door that was difficult to shut. It had to be slammed shut in order for it to close.

Later that afternoon, at approximately 1:30, Holcomb and another man approached a neighbor, David Cothan, and asked him to call 911. Holcomb, who appeared calm, accompanied Mr. Cothan to Ms. Vaughn's apartment, where Mr. Cothan saw Ms. Vaughn's body on the bed. The first officer to arrive at the scene noticed signs of rigor mortis. Ms. Vaughn's body was cold to the touch. An autopsy revealed that Ms. Vaughn had suffered massive skull fractures, specifically in the area of her right eye. The actual cause of death, however, was determined to be strangulation by a rope or a cord. Her unborn child perished with her. The State's evidence established that the baby's gestational age was from twenty-six to twenty-eight weeks.

Holcomb was interviewed at police headquarters. He claimed that he had spoken to Ms. Vaughn for the last time between 10:30 p.m. and midnight on June 26, 1994. He said that he went to a lake to fish, fell into the lake, and then went to his mother's house to get dry clothes. Shortly thereafter, on July 1 and July 2, 1994, Holcomb discussed the murders with Anthony Talley, an acquaintance. Holcomb was unaware that Talley, a convicted felon, was an informant for the F.B.I., and was wearing a wire during these conversations. Holcomb graphically described the savage beating he inflicted upon Ms. Vaughn, telling Mr. Talley that he had been planning to kill Ms. Vaughn for about eight months. He said that he felt no remorse. Holcomb described Ms. Vaughn in unflattering terms. Laughing, he told Mr. Talley that he punched her in the eye about five times and that he buried the cord he used to strangle her. Mr. Holcomb said that Ms. Vaughn "knew what was up." He asked her "How does it feel to know you're ready to die, bitch?" He said he told her: "Say your prayers. You've got five seconds to say a prayer." Holcomb also told Mr. Talley that his mother was going to provide him with an alibi and that "I knew what I was doing the whole time I was doing it. I was thinking about it." Holcomb opined that even if he

were picked up and charged, he would beat the charge.

At trial, Holcomb presented a defense based upon alibi. His mother and two other witnesses testified that he had come to his mother's house at about 2:30 a.m. on June 26, 1994 and stayed until 10:30 a.m. or 11:00 a.m. the following day. Holcomb testified in his own defense. He denied that he had ever struck Ms. Vaughn. He admitted that Ms. Vaughn was pregnant with his child. Holcomb accused Mr. Talley of committing the murders. Holcomb testified that he was afraid of Mr. Talley. Holcomb claims that he knew that Mr. Talley was working for the F.B.I. and knew that their conversations were being taped. He testified that Mr. Talley provided him with a script and instructed him to make the statements he made on the tape. During his direct examination, Holcomb informed the jury of his past convictions for possession of marijuana and exhibiting a deadly weapon. He recounted a life of crime in the company of Mr. Talley. At one point, after confessing to various robberies he committed with Mr. Talley, Holcomb confessed to participating in a robbery of a jewelry store in which a man was murdered. Then, after talking with counsel, Holcomb asserted a Fifth Amendment privilege with respect to the jewelry store robbery. The trial court ordered that Holcomb's testimony on the matter be stricken, and the court instructed the jury to disregard it.

The jury found Holcomb guilty on both counts of murder in the first degree in the deaths of Laura Vaughn and the baby. The trial court sentenced Holcomb as a prior and persistent offender to two consecutive terms of life imprisonment without the possibility of probation or parole. Holcomb appeals. Holcomb also appeals the denial of his Rule 29.15 motion for post-conviction relief. On December 4, 1995, Holcomb filed a *pro se* motion under Rule 29.15 seeking to vacate his convictions and sentences. An amended motion was timely filed. On July 9, 1996, the motion court entered an order overruling the motion without an evidentiary hearing.

In Point I, Holcomb contends that trial court erred in denying his motion to dismiss Count II, in which he was charged with the first degree murder of the baby boy. Holcomb argues that an unborn child is not a person for the purposes of the first degree murder statute. Holcomb claims that the information in Count II should have alleged viability, which he contends is an essential element.

## AN UNBORN CHILD IS A PERSON FOR PURPOSES OF § 565.020

Section 565.020.1 states, "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." The question, then, is whether an unborn child is a person for the purposes of the first degree murder statute. The State argues that the answer to that question is yes. The State asserts that *State v. Knapp*, 843 S.W.2d 345 (Mo. banc 1992) and *Connor v. Monkem Co.*, 898 S.W.2d 89 (Mo. banc 1995) dictate a ruling that an unborn child falls within the statutory definition of "person."

In 1986, the Missouri legislature enacted § 1.205, RSMo 1994 [1] which states:

1. The general assembly of this state finds that:

(1) The life of each human being begins at conception;

(2) Unborn children have protectable interests in life, health, and well-being;

(3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.

2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court and specific

1. All statutory references are to Revised Statutes

of Missouri 1994, unless otherwise indicated.

provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term **"unborn children"** or **"unborn child"** shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.

4. Nothing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care.

The relationship between § 1.205 and the question of whether an unborn child could be considered a person was first raised in *Knapp,* an involuntary manslaughter prosecution. Knapp had been convicted of involuntary manslaughter for killing an unborn child. *Knapp,* 843 S.W.2d at 346. The appellant in that case also argued that an unborn child is not a person. The Missouri Supreme Court concluded that the definition of "person" in the involuntary manslaughter statute included an unborn child. The court read § 1.205 and § 565.024 *in pari materia,* since the General Assembly passed both statutes in the same legislative session. *Id.* at 347–48. The court held:

> Reading all subsections of § 1.205 together and considering especially the express language of *Subsection 2* that "... the laws of this state shall be interpreted and construed ...," it is clear that § 1.205 is intended to apply to at least some other statutes. It is also clear that the legislature intended § 1.205 to apply to § 564.024, in particular, because both statutes were passed in the same legislative session, on the same day, and as part of the same act, H.B. 1596. Furthermore, these two statutes, both of which refer to the term "persons," are related—one defines the term "persons" for the other. Therefore, they must be read *in pari materia.* Without deciding whether § 1.205 applies to other statutes, we conclude that it applies at least to the involuntary manslaughter statute.

*Id.* (Footnote omitted). The *Knapp* court expressly reserved the question of whether

§ 1.205 applied to other statutes. *Id.* at 347–48.

That question was resolved in *Connor. Connor* was a wrongful death action in which the father of an unborn child who was killed along with the child's mother in an automobile accident, brought suit against the employer of the driver allegedly at fault. *Connor,* 898 S.W.2d at 90. In *Connor,* the Missouri Supreme Court considered the construction of § 1.205 in light of the wrongful death statute, § 537.080, a statute not passed at the same legislative session as § 1.205. In its analysis, the court in *Connor* held that § 1.205.2 sets out a rule of interpretation that it is the time of conception, and not viability, which determines when the legally protectable interests of an unborn child are deemed to arise. *Id.* at 92. The court in *Connor* clearly stated that, "Section 1.205(2) further sets out the intention of the general assembly that Missouri courts should read all Missouri statutes in *pari materia* with this section." *Id.* So stating, the court concluded that an unborn child is a person, before or after viability, within the meaning of the wrongful death statute. *Id.* Holcomb's contention that the State was required to allege viability is without merit. We hold that an unborn child is a person for purposes of § 565.020.

## DUE PROCESS CONTENTION

Holcomb argues that there are constitutional problems in defining an unborn child as a person in light of Chapter 188, the statutory section regulating abortion in Missouri. The penalties for performing an abortion contrary to the provisions of Chapter 188 are less severe than the penalty for committing murder in the first degree. Section 188.075 provides that failing to comply with §§ 188.010 to 188.085 is a class A misdemeanor. Section 188.080 makes an abortion performed by anyone other than a licensed physician a class B felony. Holcomb reasons that the death of the unborn baby in this case is equivalent to an illegal abortion. Holcomb contends that the death of an unborn infant cannot be prosecuted as a murder because the statutes explicitly set out the penalties for illegal abortions. Holcomb ar-

gues that his rights under the due process and equal protection clause of the fourteenth amendment are violated by an arbitrary and unreasonable decision to prosecute him for murder when someone else performing an unlawful abortion would not be so prosecuted.

Arguably, Holcomb has not adequately preserved this point for review. Holcomb moved to dismiss Count II before his trial on the grounds that the baby was not a "person" within the meaning of § 565.020, but he did not specify any constitutional claims in relation to this issue. *See State v. Chambers,* 891 S.W.2d 93, 103–04 (Mo. banc 1994). However, given the importance of the question raised, and given the fact that the constitutional claim is closely related to the issue of whether an unborn child is a person, we will exercise our discretion to review this point.

### MURDER OF THE UNBORN

The high rate of stillborn deliveries and miscarriages in earlier times created a presumption that an unborn child would die in the process of childbirth. *People v. Greer,* 79 Ill.2d 103, 37 Ill.Dec. 313, 317, 402 N.E.2d 203, 207 (1980). Also, until recent advances in medical technology, there was no way to determine, prior to the point of "quickening" (when the baby is felt to move), whether the fetus was alive in the womb. *See Hughes v. State,* 868 P.2d 730, 732 (Okla.Crim.App. 1994). Consequently, at common law, the commission of an assault on a mother causing the death of an infant amounted to murder only when the child was born alive and then died as a result of the assault on the mother. *Hughes,* 868 P.2d at 732–33. *See also Commonwealth v. Lawrence,* 404 Mass. 378, 536 N.E.2d 571, 576 (1989). Some states retain the common law "born alive" rule although the rates of stillborn deliveries and miscarriages have significantly declined. *See, e.g., State v. Beale,* 324 N.C. 87, 376 S.E.2d 1 (1989); *Meadows v. State,* 291 Ark. 105, 722 S.W.2d 584 (1987); *State v. Green,* 245 Kan. 398, 781 P.2d 678 (1989). The courts have reasoned that the creation and expansion of any criminal offense is a legislative prerogative. *Beale,* 376 S.E.2d at 4. Some other states, in contrast, have held that an unborn child is a human being for the purposes of the common law crime of murder. *See Commonwealth v. Lawrence,* 404 Mass. 378, 536 N.E.2d 571 (1989). *See also Hughes v. State,* 868 P.2d 730 (Okla.Crim.App.1994); *State v. Horne,* 282 S.C. 444, 319 S.E.2d 703 (1984).

As we have already seen, the legislature in Missouri has been understood to have declared that an unborn child is a person to the full extent permitted by the Constitution of the United States:

> It is the intention of the general assembly of the state of Missouri to grant the right to life to all humans, born and unborn, and to regulate abortion to the full extent permitted by the Constitution of the United States, decisions of the United States Supreme Court, and federal statutes.

§ 188.010, RSMo 1994.

Holcomb recognizes that the U.S. Supreme Court has created legal reasons for a distinction between a mother's decision to have an abortion and the killing of a child through the strangling and beating of the mother. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The fact that a mother of a pre-born child may have been granted certain legal rights to terminate the pregnancy does not preclude the prosecution of a third party for murder in the case of a killing of a child not consented to by the mother. Addressing this issue in the tort context, the Missouri Supreme Court has said:

> *Roe v. Wade,* while holding that the fetus is not a "person" for the purposes of the 14th amendment, does not mandate the conclusion that the fetus is a legal nonentity. "The abortion issue involves the resolution of the mother's rights as against the child when the two are in conflict. Whatever may be the determination of the rights in that context, this special relation gives a third-party tortfeasor no comparable rights." Note, *"Torts–Wrongful Death–Unborn Child"* 70 Mich.L.Rev. 729, 746–747 (1972).

*O'Grady v. Brown,* 654 S.W.2d 904, 910 (Mo. banc 1983).

Chapter 188 regulates abortions in the State of Missouri. Its provisions deal with

the limited legal right of the mother to have an abortion and the interests of the state in preserving the life of the pre-born child. The abortion statutes provide very specific guidelines, however, concerning who may perform an abortion and under what circumstances an abortion may be performed. Section 188.020 provides that only a physician may induce an abortion. An abortion performed after sixteen weeks is to be performed at a hospital. Section 188.025, RSMo 1994. Section 188.027 provides, "No abortion shall be performed except with the prior, informed and written consent freely given of the pregnant woman." The form of that consent is described in § 188.039. An abortion of a viable unborn child is to be performed only where "necessary to preserve the life or health of the woman." Section 188.030, RSMo 1994. Section 188.075 provides that failing to comply with §§ 188.010 to 188.085 is a class A misdemeanor. Section 188.080 makes an abortion performed by anyone other than a licensed physician a class B felony.

We conclude that the abortion statutes assume the actual or apparent consent of the mother. For instance, an abortion performed by someone other than a physician, and yet performed with the mother's consent, would be an abortion which could be prosecuted as a Class A misdemeanor. Any party performing an abortion without the mother's **written** consent, but with her **actual** consent, could also be charged and found guilty of a Class A misdemeanor.

Holcomb argues that all intentional and unjustified killings of pre-born children must be treated the same. Holcomb does not answer the implicit question of whether his actions violated the abortion provisions of Chapter 188. Rather, instead he argues that the effect of his alleged actions was the same as that of an abortion. Holcomb may well be correct that an abortion performed forcibly and involuntarily as to the mother, without her actual consent, is essentially equivalent to the killing of the child in the fashion in which Holcomb did it. However, we do not believe actions such as his were addressed in Chapter 188, because 1) his actions were not the kind of actions ordinarily considered to

be the performance of an abortion; and 2) the mother did not consent to the actions. Moreover, Holcomb fails to show that the state has applied the misdemeanor abortion statutes to individuals alleged to have forcibly aborted a pre-born infant against the will of the mother. Nor has he shown that the state would not or could not in fact bring a murder charge against an individual accused of such an act. Holcomb has not shown that the legislature ever intended, in the statutes regulating abortion, to treat the unconsented (by the mother) killing of a pre-born infant, in the context of a physical assault on the mother, as anything other than a murder of the infant. We believe this is true regardless of whether the instrumentality of the child's death is a set of forceps applied to the body of the child in the womb, or a cord applied to the neck of the mother. Thus, a husband or boyfriend of a woman who forcibly aborts a fetus against the will of the woman by physically restraining or assaulting the woman, could, under the Missouri statutes, be prosecuted for the murder of the unborn child, even if the mother is not otherwise injured. It is basic doctrine of *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and it is understood by persons on all sides of the abortion controversies, that *Roe* limited to the mother the legal right to consent to the destruction of the unborn child. Because Laura Vaughn never consented to the death of her unborn infant, Holcomb's contention that he is victimized by an arbitrary, capricious, and discriminatory felony prosecution is without merit.

The result we reach is consistent with rulings in other jurisdictions. *See generally* Annotation, *Homicide Based on Killing of Unborn Child*, 40 A.L.R.3d 444 (1971). In *People v. Davis*, 19 Cal.Rptr.2d 96 (Cal.App. 1993), aff'd. en banc, 7 Cal.4th 797, 30 Cal. Rptr.2d 50, 872 P.2d 591 (1994), the defendant was charged with the murder of an unborn child during the course of a robbery. Although the court reversed the judgment of murder and remanded the case because of instructional error, the court examined § 187(a) of the California Penal Code which provides that "[m]urder is the unlawful killing of a human being, or a fetus, with malice aforethought." *Id.* at 98. The court exam-

ined *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, (1973), and concluded that *Roe* did not apply to circumstances in which a third party kills an unborn child without the consent of the mother. *Davis*, 19 Cal. Rptr.2d at 102.

In *State v. Merrill*, 450 N.W.2d 318 (Minn. 1990), the defendant was indicted on counts of first and second degree murder for killing both a mother and her unborn child. In Minnesota, there are specific statutes making the murder of an unborn child a crime in both the first degree and the second degree. *Id.* at 320. The two statutes contain exactly the same language as the statutes for first and second degree murder save that the term "unborn child" is substituted for "human being" and "person." *Id.* The defendant challenged these statutes, contending that they violated the equal protection clause under the teachings of *Roe v. Wade* in that *Roe* holds that a nonviable fetus is not a person. The court in *Merrill* held that *Roe* does not "confer on an assailant, a third-party unilateral right to destroy the fetus." *Merrill*, 450 N.W.2d at 321–22.

The Supreme Court of Wisconsin resolved a similar issue in *State v. Black*, 188 Wis.2d 639, 526 N.W.2d 132 (1994), distinguishing between the termination of a pregnancy and an intentional criminal act. *Id.* 526 N.W.2d at 135. *See also Brinkley v. State*, 253 Ga. 541, 322 S.E.2d 49, 51–52 (1984); *People v. Ford*, 221 Ill.App.3d 354, 163 Ill.Dec. 766, 776, 581 N.E.2d 1189, 1199 (1991). Some states have enacted statutes declaring feticide a crime. *See State v. Smith*, 676 So.2d 1068, 1070 (La.1996) (examines feticide statutes of California, Arizona, and Indiana).

Comparable arguments are made in cases involving wrongful death statutes. For example, in *Wiersma v. Maple Leaf Farms*, 543 N.W.2d 787, 791 (S.D.1996) the court rejected the argument that it was inconsistent to provide an action for the wrongful death of a fetus while, at the same time, allowing an abortion to take place through the 24th week of a woman's pregnancy.

## LESSER-INCLUDED OFFENSE INSTRUCTIONS

█ In Point II, Holcomb contends that the trial court erred in failing and refusing to submit an instruction on murder in the second degree to the jury. Holcomb claims that there was evidence that would have supported a jury finding that Holcomb knowingly killed Laura Vaughn and the baby but did not deliberate before doing so. In Point III, Holcomb contends that trial counsel was ineffective by not tendering an instruction on murder in the second degree. During the instructions conference the trial court indicated that the forms for second degree murder were not needed. Holcomb did submit instructions on voluntary manslaughter, but these instructions were refused. Although defense counsel stated that he believed that there would be sufficient evidence for the jury to find Holcomb guilty of murder in the second degree, instructions to that effect were never offered. There is no evidence in the record, however, that would support such instructions.

█ Section 565.020.1, the statute defining the crime of murder in the first degree, states: "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." "Deliberation" is defined as "cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo 1994. The element of deliberation is what separates first degree murder from second degree murder. Section 565.021, the second degree murder statute states, in pertinent part:

1. A person commits the crime of murder in the second degree if he:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

(2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the

perpetration of such felony or attempted perpetration of such felony.

. . . .

3. Notwithstanding section 556.046, RSMo, and section 565.025, in any charge of murder in the second degree, the jury shall be instructed on, or, in a jury-waived trial, the judge shall consider, any and all of the subdivisions in subsection 1 of this section which are supported by the evidence and requested by one of the parties or the court.

In most homicide cases, the defendant is entitled to an instruction on murder in the second degree, although it is not required in every case where first degree murder is charged. *State v. Santillan,* 948 S.W.2d 574, 576–77 (Mo. banc 1997). Second degree murder instructions are not warranted where the evidence supports nothing other than a finding of deliberation. *State v. Mease,* 842 S.W.2d 98, 111 (Mo. banc 1992).

Holcomb points out that there was no eyewitness to the death of Laura Vaughn and no evidence as to what lead to the beating that caused her death. There is no requirement that a defendant put on affirmative evidence as to lack of deliberation in order that a second degree instruction be submitted. *Santillan,* at 576. *Santillan* overruled *State v. Olson,* 636 S.W.2d 318 (Mo. banc 1982) and *State v. Chambers,* 884 S.W.2d 113 (Mo.App.1994) to the extent that they could be read to require that a defendant put on some affirmative evidence as to the lack of an essential element of a higher offense. *Santillan,* at 576. Instead the rule is that, "[i]f a reasonable juror could draw inferences from the evidence presented that the defendant did not deliberate, the trial court should instruct down." *Id.* Although in this case Holcomb did not present evidence of the lack of deliberation, and he was not required to do so, there must be some evidence that there was a lack of deliberation in the murder of Laura Vaughn and her unborn baby for an instruction on murder in the second degree to be deemed appropriate. There is no evidence at all that Holcomb did not deliberate. Indeed, there is an abundance of evidence to the contrary.

Although Holcomb contends that he made no direct confession to the murders, the contents of the tapes of his conversations with Mr. Talley contain Holcomb's admission that he planned the killings for months. Mr. Talley asked Holcomb if he "got just mad and flipped and went off." Holcomb told Mr. Talley, "I knew what I was doing the whole time I was doing it. I was thinking about it." The method used by Holcomb to murder Ms. Vaughn and the baby was significant in that the beating and strangulation shows deliberation. Also, Holcomb did not at any time seek medical aid for Ms. Vaughn or the baby. That he did not is evidence of the element of deliberation. *See State v. Feltrop,* 803 S.W.2d 1, 12 (Mo. banc 1991). There was also evidence that months before Ms. Vaughn's death, Holcomb had threatened to kill her and her unborn child.

Holcomb also argues that it is "logical" that the baby's death was second degree murder, because his death occurred as a result of the murder of Laura Vaughn. Again, there is no evidence that Holcomb did not deliberate when he murdered the baby. He had threatened to kill the unborn child months before the actual murder. Holcomb admitted knowing that Ms. Vaughn was pregnant with his child. Ms. Vaughn was seven months pregnant at the time of the murders. It is reasonable to infer that Holcomb knew that the death of the baby would necessarily result from the murder of Ms. Vaughn. Holcomb did not seek aid for the baby.

There was no basis in the evidence upon which the jury could find that Holcomb committed the murders without deliberation. Hence, an instruction on second degree murder was not warranted. Consequently, trial counsel cannot be found ineffective for failing to request such instruction. *State v. Kobel,* 927 S.W.2d 455, 462 (Mo.App.1996). Points II and III are denied.

## HOLCOMB'S DECISION TO TESTIFY

Holcomb argues that the motion court clearly erred in denying his Rule 29.15 motion without an evidentiary hearing. He claims that trial counsel was ineffective in advising him as to the testimony he should

give when he testified in his own defense. He claims that the record does not clearly refute his claim and, therefore, an evidentiary hearing was necessary. The motion court, in its findings and conclusions, stated:

Movant's last allegation is clearly refuted by the record. On pages 679 and 680 counsel asked movant on the record if he knew what he was doing by testifying about Talley's robbery and murder and if counsel had discussed the ramifications of such testimony with movant. Movant acknowledged that all this had been discussed and it was movant's decision to testify as he did. It was clearly trial strategy throughout that movant was terrified of Anthony Talley and that was why he confessed on the tape. It is also clear from movant's testimony that it was his decision to testify as he did and not the result of counsel's advice.

Review of the motion court's findings and conclusions is limited to determining whether those findings and conclusions are clearly erroneous. *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995); Rule 29.15(k). The motion court's findings and conclusions will be deemed clearly erroneous when, after review of the entire record, an appellate court is left with the definite and firm impression that a mistake was made. *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995).

■ To successfully demonstrate ineffective assistance of counsel, movant must satisfy a two-prong test, showing: (1) that counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under similar circumstances; and (2) that defendant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). A movant must satisfy both parts of this test. Should a movant fail to satisfy either the performance prong or the prejudice prong, we need not consider the other. *State v. Whitfield*, 939 S.W.2d 361, 369 (Mo. banc 1997). Prejudice is established where it is shown by a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *State v. Tokar*, 918 S.W.2d 753, 761 (Mo. banc), *cert. denied*, — U.S. —,

117 S.Ct. 307, 136 L.Ed.2d 224 (1996). The movant must show that the factfinder would have had a reasonable doubt as to guilt absent the alleged error. *State v. Gordon*, 915 S.W.2d 393, 398 (Mo.App.1996). It is presumed that counsel performed effectively; the movant assumes a heavy burden in attempting to overcome this strong presumption by a preponderance of the evidence. *Tokar*, 918 S.W.2d at 761. "The benchmark for judging ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *State v. Graham*, 906 S.W.2d 771, 784 (Mo.App.1995). Counsel's actions that constitute sound trial strategy are not grounds for ineffective assistance claims. *Whitfield*, 939 S.W.2d at 369.

■ In order to obtain an evidentiary hearing, a movant must meet the following criteria: (1) his motion must allege facts, not conclusions, that would warrant relief; (2) these facts must raise matters that cannot be refuted by the records and files in the case; and (3) he must show prejudice. *State v. Starks*, 856 S.W.2d 334, 336 (Mo. banc 1993). A hearing is not required where the motion court makes the determination that the motion, the files, and the records of the case conclusively demonstrate that the movant is not entitled to relief. *State v. Blankenship*, 830 S.W.2d 1, 16 (Mo. banc 1992). In this case, Holcomb's contention that trial counsel was ineffective by allowing him to testify, is refuted by the record.

Before Holcomb took the stand in his own defense, he was questioned quite thoroughly on his decision to testify. Holcomb testified that he and counsel had discussed the question of whether Holcomb should testify for quite a while. Holcomb stated that it was his wish to testify and that he made that decision freely. The trial court further informed Holcomb that if he chose to testify, the State could not bring up his prior record. Holcomb understood that he did not have to testify and that neither trial counsel, nor the trial court could force him to testify.

Holcomb took the stand in his own defense. He acknowledged his criminal record

and testified about his involvement with Mr. Talley. Holcomb explained that he was afraid of Mr. Talley. During this testimony, Holcomb made incriminating statements about his involvement with a murder which occurred during the robbery of a jewelry store. At this point in the proceedings, Holcomb was asked again about his decision to testify outside the presence of the jury:

> THE COURT: Yeah. Do you understand that you've just confessed to a felony murder?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you can be charged with that murder. You're not—do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Go ahead.
>
> Q. (By Mr. Jaco) For the record, Mr. Holcomb, you and I have discussed this, have we not?
>
> A. Yes.
>
> Q. I've advised you any statement you make here under oath can be used against you?
>
> A. Yes.
>
> Q. And that charges could be filed on these robberies and/or the felony murder?
>
> A. Yes.
>
> Q. Have you had ample time to discuss this and think about it? Is that correct?
>
> A. Yes.
>
> Q. It's your choice to go ahead and testify?
>
> A. Yes.
>
> Q. And you waive your right not to testify, right, and we have advised you of all these rights many times?
>
> A. Yes.
>
> Q. And you wish to go forward? You wish to testify about this?
>
> A. Yes. Could I speak with you before we go any further?
>
> Q. Yes.

At this point in the proceedings, Holcomb consulted with counsel. He decide to recant his testimony and assert his Fifth Amendment privilege against self-incrimination concerning the jewelry store robbery. The court allowed Holcomb to assert the privilege and ordered that testimony on the matter be stricken. He ordered the jury to disregard the testimony.

The record reflects that counsel warned Holcomb of the risks of testifying. Holcomb, aware of the risks inherent in his proposed testimony, proceeded to testify in his own defense. It is apparent from the record that it was Holcomb who made the decision to testify. This is a fundamental decision that a defendant has a right to make. *State v. Debler*, 856 S.W.2d 641, 655 (Mo. banc 1993). It is an attorney's duty to advise his client as to the consequences of his choices and then to implement the decision made by his client. *Id.* We cannot find counsel ineffective for failing to save a client from the effect of the client's own informed decision. "Counsel is not ineffective simply because he accedes to his client's wishes, regardless how mistaken counsel believes those wishes to be." *Guinan v. State*, 769 S.W.2d 427, 429 (Mo. banc 1989).

■ The decision of whether a defendant should testify in his own defense is, of course, often an extremely difficult decision. *State v. Powell*, 798 S.W.2d 709, 718 (Mo. banc 1990). As a general rule, advice of counsel on the decision of whether or not to testify is a matter of trial strategy. *State v. Dees*, 916 S.W.2d 287, 301 (Mo.App.1995). Absent exceptional circumstances, it is not grounds for post-conviction relief. *State v. Weathersby*, 935 S.W.2d 76, 81 (Mo.App.1996).

Holcomb's admissions to Mr. Talley in the taped conversation were damning. His graphic and detailed description of the murders was tantamount to a videotape of the crime itself. Unless Holcomb could somehow explain away the comments he made on the tape, his fate was certain. The motion court did not clearly err in finding that counsel was not ineffective in regard to Holcomb's decision to testify. Point IV is denied.

## TRIAL COURT'S COMMENT

■ In his final point, Holcomb contends that the trial court abused its discretion by failing to declare a mistrial following a comment that the trial court made in response to defense counsel when ruling on an objection.

During defense counsel's cross-examination of Detective John Jackson, the following exchange occurred:

> Q. [Defense counsel] All right. Did Mr. Holcomb volunteer the blood sample, or did you have to obtain a court order to get it?
>
> A. [Detective Jackson] He volunteered.
>
> Q. Is that the action of a guilty person?
>
> MR. MILLER: I'll object to that, that it's self-serving and irrelevant.
>
> THE COURT: Sustained.
>
> Q. (By Mr. Jaco) You didn't have to go get a court order, did you?
>
> A. No.
>
> Q. And he spoke to you for 6½ hours; is that right?
>
> A. Correct.
>
> Q. Did you have to get a court order to get these Reeboks?
>
> MR. MILLER: Objection again, irrelevant and self-serving.
>
> THE COURT: What difference does it make?
>
> MR. JACO: Show whether or not he was telling the truth, your Honor, and whether his story is the same.
>
> THE COURT: That's your interpretation of it. That's not his or mine or anyone else's. Sustained.

After this exchange, defense counsel approached the bench and asked the court for a mistrial because the remark the court made was prejudicial to his client. The trial court denied the request. Holcomb claims that the trial court's remark was an improper comment upon the evidence that prejudiced the minds of the jury against the defense and, as a result, he was denied a fair and impartial trial.

 A mistrial is a "drastic remedy" that should be granted only where the circumstances are extraordinary. *State v. Clover*, 924 S.W.2d 853, 856 (Mo. banc 1996). It is a remedy that is to be exercised only where prejudice to a defendant cannot otherwise be eliminated. *State v. Johnson*, 901 S.W.2d 60, 62 (Mo. banc 1995). The trial court, in the dialogue with defendant's counsel, was commenting on the evidentiary value to the defendant of showing that the defendant voluntarily surrendered his shoes as evidence. To that extent, it might have been a comment on the relevancy of the particular inquiry. However, it was not a comment expressing the court's view of the evidence overall. The trial court's comment was not a comment upon the evidence. While it also could be construed as a criticism of the tactics of defense counsel, that alone is not sufficient to require the declaration of a mistrial. *See State v. Moffitt*, 754 S.W.2d 584, 589 (Mo. App.1988).

The comment in this case is similar to one reviewed by the Southern District in *Moffitt*. The trial judge in *Moffitt*, after an objection by the State, addressed defense counsel saying, "The jury understands she doesn't know exactly which weekend it was. Lets move on, we're quibbling over words that are plain to the jury." *Id.* at 588. On appeal, the Southern District held that these were not comments on the evidence or on the credibility of a witness and found that, at most, the comments might be construed as a mere criticism of defense counsel. *Id.*

Here, the trial court's impatience with counsel did not indicate a belief in Holcomb's guilt, nor would the remarks have been construed as evidencing a general hostility toward the defense. *See State v. Davis*, 653 S.W.2d 167, 177 (Mo. banc 1983). The jury could have recognized that the court's comments were an attempt to admonish counsel to move along to more pertinent matters. The trial court did not abuse its discretion in denying the motion for a mistrial.

## CONCLUSION

The judgment of the trial court is affirmed. The judgment of the motion court is affirmed.

BERREY, P.J., and EDWIN H. SMITH, J., concur.