STATE of Missouri,
Plaintiff/Respondent,

v.

Paul ROLLEN, Defendant/Appellant.

No. ED 81618.

Missouri Court of Appeals,
Eastern District,
Division Five.

Dec. 2, 2003.

Application for Transfer to Supreme Court
Denied March 11, 2004.

Application for Transfer Denied
May 25, 2004.

Ellen H. Flottman, Public Defender's Office Columbia, MO, for Appellant.

John M. Morris, Richard Anthony Starnes, Attorney General's Office, Jefferson City, MO, for Respondent.

SHERRI B. SULLIVAN, Chief Judge.

## Introduction

Paul Rollen (Defendant) appeals from a judgment of conviction of one count of robbery in the first degree, two counts of felony murder in the second degree, and three counts of armed criminal action. Defendant challenges the sufficiency of the evidence for conviction of one of the felony murder counts and one of the armed criminal action counts because the counts applied to the unborn child of Brandi Roussin (Victim). Associated with this claim of error, we must decide whether or not an unborn child is a "person" for purposes of the felony murder in the second degree statute. Defendant also alleges that the trial court plainly erred in failing to compel a witness to testify after the witness asserted his Fifth Amendment privilege against self-incrimination, though the witness already had pled guilty to the charged offenses. We affirm.

## Factual and Procedural Background

Viewed in the light most favorable to the verdict, the evidence presented at trial established the following relevant facts. Defendant worked at a convenience store from April to October 19, 2000, at which time he was fired from his job due to shortages in his cash drawer. Victim, the assistant manager of the convenience store, played a role in Defendant's firing. In the last week of October 2000, Victim was seventeen weeks pregnant.

As part of her duties, Victim would deposit the money received by the store at a bank. She put the money in a bank bag and then placed that bag in a brown paper bag to conceal the bank bag. On Sundays, Victim's routine would be to take the deposit to the bank at around 2:00 p.m. when she finished work. She drove her gray Cutlass, which was always parked in the same parking space outside the store, to the bank. The employees of the store knew Victim's routine. On one Sunday, Defendant accompanied Victim on this task because she gave him a ride home. Defendant lived about a mile from the store.

On October 26, 2000, Defendant went to the store to pick up his last paycheck. He became irate and started yelling after an

employee told him that he would have to wait until she got a hold of Victim, who was not present, because Victim was the only one who could give him his check. Eventually, the employee gave Defendant his check. Defendant became angry again when he noticed that the amount of his check was for less than he had expected. He yelled "If you mother _____ want to play games I will play some _____,' games. I will be back."

On Sunday, October 29, 2000, a few minutes before 2:00 p.m., Defendant went to the store. He bought a bag of potato chips and spoke with the cashier about his insurance when he worked at the store. The cashier said that Victim was in the back room and Defendant could go back there to speak with her. Defendant, who previously had been friendly and talkative with other store employees, was solemn, quiet, and had a "cold look" on his face. After speaking with Victim, Defendant left the store.

As Defendant went to his car, he nodded at Donnell Williams (Williams), a black male, who was sitting in a four-door maroon car with no license plates and a temporary tag in the rear window parked next to Victim's car. The front of Williams' car was facing the store. Defendant got into his car and drove to the tire air pump located in the store lot, where he got out of and stood against his car.

A couple minutes after Defendant exited the store, Victim left the store with the bag for the bank. When she reached her car, Williams pointed a handgun at Victim and fired a single gunshot into her chest. Williams then drove his car to where Victim dropped the bag for the bank, picked up the bag, and drove off.

Hearing the gunshot, employees in the store rushed outside to aid Victim. Defendant, who had remained standing against his car watching the incident with no ex-

pression, got into his car and drove off as Victim fell to the ground. Victim died before paramedics reached the scene.

Later that day, the police contacted Defendant as a possible witness to the crimes. A detective and a uniformed police officer went to Defendant's apartment and knocked on the door for about fifteen minutes. Defendant eventually answered the door, told the officers that he had been at the store that day, and agreed to accompany the officers to the police station to make a statement.

That evening, the police went back to Defendant's apartment where they obtained written consent from Defendant's mother and girlfriend, who also lived at the apartment at the time, to search Defendant's bedroom. In the bedroom closet, the police found a white sock containing $1,170 in cash and a box of Winchester .38 caliber ammunition.

The police also obtained written consent to search Defendant's girlfriend's apartment, which was in the same apartment complex. Defendant and his girlfriend had lived at her apartment prior to the electricity being turned off, at which time they moved into Defendant's mother's apartment. Defendant had a key to his girlfriend's apartment. At the girlfriend's apartment, the police found $4,000 in cash under some underwear in a bedroom dresser drawer. Neighbors near the apartment saw Defendant come out of the apartment earlier that day, get into a maroon car with no license plates and a temporary tag in the rear window where he spoke with a black male, and then return to the apartment, looking "excited and joyous."

Later that evening, a detective at the apartment complex saw a maroon car with no license plates and a temporary tag in the rear window drive alongside Defen-

dant's apartment, turn around, and leave. The police followed the car to a restaurant, where Williams, who was driving the car, had to be forcibly removed from the car and subsequently was arrested.

In the basement of Williams' house, the police found a .38 caliber handgun, ammunition, cash, a bank bag, and a piece of paper with a telephone number and the name "Paul" written on it. The ammunition was the same ammunition as that found at Defendant's apartment.

Meanwhile, at the police station, a detective conducted a witness interview with Defendant. Defendant initially told the detective that he had witnessed the crimes, had run to help Victim after she was shot, and then left the scene. At one point, the detective left the interview room to check on the status of the investigation. He learned that Defendant had been seen in a car earlier that day that matched the description of the suspect vehicle. At that point, the detective advised Defendant of his *Miranda* rights, and Defendant signed a written waiver of those rights.

Defendant continued to tell different versions of the day's events until he finally confessed to the following: Defendant planned the robbery with Williams. They decided they needed two cars so Defendant drove Williams to Williams' house to get the maroon car. They then returned to Defendant's apartment. Defendant went into his apartment to retrieve a handgun that he had borrowed from Williams two weeks earlier. Defendant gave the gun to Williams. They then left Defendant's apartment at about the same time and drove in separate cars to the store. Defendant entered the store, spoke with Victim, exited the store, looked at Williams and nodded to signal that Victim was there and that the robbery was still on. After

seeing Williams shoot Victim and pick up the bag of money, Defendant drove to Williams' house, where Williams gave him about $5,000 from the robbery. Defendant then drove back to his apartment complex where he hid $4,000 in a drawer at his girlfriend's apartment and about $1,200 in a sock in a closet at his apartment.

Victim died from a gunshot wound that entered the left side of her chest, went through her heart and part of her lung, and lodged in the right side of her back. The bullet that killed Victim matched the ammunition found at Williams' house and was consistent with other bullets fired from the handgun found at his house. Victim's unborn child, which was a boy, was alive until Victim died, and then he also died when Victim died.

Defendant was charged as a prior offender with one count of robbery in the first degree, a Class A felony in violation of Section 569.020,[1] two counts of felony murder in the second degree, a Class A felony in violation of Section 565.021.1(2), and three counts of armed criminal action, a felony in violation of Section 571.015. One of the felony murder counts (Count V) and one of the armed criminal action counts (Count VI) applied to Victim's unborn child.

Prior to trial, Defendant filed a motion to dismiss Counts V and VI arguing that a "fetus" is not a person under Section 565.021.1(2) and defining it as such pursuant to Section 1.205 is unconstitutional. The trial court denied the motion. The case proceeded to a four-day jury trial.

At trial, defense counsel sought to call Williams as a witness. In an offer of proof, Williams stated that if called, he intended to assert his Fifth Amendment privilege against self-incrimination. The trial court stated that Williams already

1. All statutory references are to RSMo. (2000), unless otherwise indicated.

had pled guilty to the facts of this case, and thus the Fifth Amendment privilege may not apply, unless there was a different reason, such as the possibility of being charged with another crime.[2] The trial court did not compel Williams to testify. Defense counsel then sought to introduce statements made by Williams to the police. In an offer of proof, defense counsel stated that Williams' statements included that Defendant did not identify Victim's car for Williams or provide a signal to Williams indicating when Victim was exiting the store or if she had the bank bag. However, the trial court found that the statements did not meet any exception to the hearsay rule, were not trustworthy, and therefore the statements were inadmissible. Defendant did not testify at trial.

Defendant filed a motion for judgment of acquittal at the close of the State's evidence and at the close of all the evidence. The trial court denied both motions. Subsequently, the jury returned a verdict finding Defendant guilty as charged. Defendant filed a motion for new trial, which the trial court denied. The trial court entered a judgment in accordance with the jury verdict and sentenced Defendant as a prior offender to six consecutive terms of life imprisonment. Defendant appeals from the convictions and sentence.

### Discussion

Defendant raises two points on appeal. In his first point, Defendant argues that the trial court erred in denying his motion to dismiss Counts V and VI, and subsequent motion for judgment of acquittal, because insufficient evidence existed to show that Victim's unborn child was a "person" within the meaning of Section 565.021.1(2).

**2.** The trial court gave the example of perjury.

In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we do not weigh the evidence but rather we determine whether there is sufficient evidence from which a reasonable trier of fact might have found the defendant guilty beyond a reasonable doubt. *State v. Shinn,* 921 S.W.2d 70, 72–73 (Mo.App. E.D.1996). The evidence, including all reasonable inferences drawn therefrom, is viewed in the light most favorable to the verdict, and all evidence and inferences to the contrary are disregarded. *Id.* at 72. The trier of fact determines the credibility of the witnesses. *Id.* at 73. The trier of fact may believe all, some or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case. *Id.*

Section 565.021.1 provides in relevant part:

A person commits the crime of murder in the second degree if he:

. . .

(2) Commits . . . any felony, and, in the perpetration . . . of such felony . . . another *person* is killed as a result of the perpetration . . . of such felony.

(emphasis added).

The issue before us, then, is whether or not an unborn child is a "person" for purposes of the felony murder in the second degree statute.

Neither Chapter 565 nor the criminal code defines the term "person." However, Missouri courts have looked to Section 1.205 to conclude that an unborn child is a person for purposes of certain Missouri statutes.

Section 1.205 provides in relevant part:

1. The general assembly of this state finds that:

(1) The life of each human being begins at conception;

(2) Unborn children have protectable interests in life, health, and well-being;

(3) The natural parents of unborn children have protectable interests in the life, health, and well-being of their unborn child.

2. Effective January 1, 1988, the laws of this state shall be interpreted and construed to acknowledge on behalf of the unborn child at every stage of development, all the rights, privileges, and immunities available to other persons, citizens, and residents of this state, subject only to the Constitution of the United States, and decisional interpretations thereof by the United States Supreme Court and specific provisions to the contrary in the statutes and constitution of this state.

3. As used in this section, the term "unborn children" or "unborn child" shall include all unborn child or children or the offspring of human beings from the moment of conception until birth at every stage of biological development.

In *State v. Knapp*, 843 S.W.2d 345, 350 (Mo. banc 1992), the Missouri Supreme Court held that the provisions of Section 1.205, namely that an unborn child is to be considered a person,[3] apply to define the term "person" in the involuntary manslaughter statute such that under Section 565.024, causing the death of an unborn child is causing the death of a "person." Applying rules of statutory construction, the court concluded that Section 1.205 is intended to apply to at least some other statutes,[4] and in particular to the involuntary manslaughter statute.[5] *Id.* at 347–348. However, the court expressly reserved the decision of whether or not Section 1.205 applies to other statutes. *Id.* at 347.

The court answered that question in *Connor v. Monkem Co., Inc.*, 898 S.W.2d 89, 92 (Mo. banc 1995) when it held that a nonviable unborn child is a "person" capable of supporting a claim for wrongful death pursuant to Section 537.080. In reaching this holding, the court examined whether or not, in enacting Section 1.205.2, the general assembly expressed an intention that a nonviable unborn child be deemed a "person" for purposes of a Section 537.080 wrongful death claim. *Id.*[6] The court concluded that Section 1.205.2 sets out a canon of interpretation enacted by the general assembly "directing that the time of conception and not viability is the determinative point at which the legally protectable rights, privileges, and immunities of an unborn child should be deemed

---

**3.** The court stated:
That unborn children have 'protectable interests in life, health, and well-being,' and enjoy '. . . all the rights . . . of *other persons* . . .' (emphasis added) necessarily implies that unborn children are persons, at least for purposes of Section 1.205.
*Id.* at 347.

**4.** In drawing this conclusion, the court read all subsections of Section 1.205 together and considered especially the express language of subsection 2 that ". . . the laws of this state shall be interpreted and construed. . . ." *Id.* at 347.

**5.** The court noted that both Sections 1.205 and 565.024 "were passed in the same legislative session, on the same day, and as part of the same act, H.B. 1596." Further, the two statutes, "both of which refer to the term 'persons,' are related—one defines the term 'persons' for the other. Therefore, they must be read *in pari materia*." *Id.* at 347.

**6.** We note that Section 537.080 was not passed at the same legislative session, on the same day, and as part of the same act as Section 1.205.

to arise." *Id.* The court further stated that Section 1.205.2 "sets out the intention of the general assembly that Missouri courts should read all Missouri statutes *in pari materia* with this section." *Id.*

Our colleagues in the Western District also have considered the construction of Section 1.205 as it relates to the first-degree murder statute, Section 565.020.1. In *State v. Holcomb*, 956 S.W.2d 286, 290 (Mo.App. W.D.1997), the court held that an unborn child is a "person" for purposes of the first-degree murder statute. In reaching its holding, the court looked to the *Knapp* and *Connor* decisions for guidance.

■ We see no distinction between the reasoning used in *Holcomb* and that which we should use here. Therefore, we hold that an unborn child is a "person" for purposes of the felony murder in the second degree statute. To hold otherwise would be illogical in light of *Knapp, Connor*, and *Holcomb*. The general assembly's value of an unborn child as expressed in Section 1.205 and as applied in these cases does not change depending on the degree of the criminal killing, e.g., first-degree murder, second-degree murder, or involuntary manslaughter. The principle is the same, and we follow the precedent.

■ Defendant cites to *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) to support his argument. We do not find these cases dispositive of the issue on appeal.[7] In *Knapp*, the court noted that Section 1.205 deals exclusively with unborn children, and thus it is not an "abortion statute." 843 S.W.2d at 349.[8] As in *Holcomb*, we find a significant distinction between a mother's right to terminate her pregnancy and the prosecution of a third party for murder of an unborn child without the consent of the mother, an intentional criminal act. 956 S.W.2d at 291. We also note that in *Webster*, the United State Supreme Court stated that Section 1.205 does not by its terms regulate abortion. 492 U.S. at 506, 109 S.Ct. 3040. The Court further stated that "the extent to which [the language of Section 1.205] might be used to interpret other state statutes or regulations is something that only the courts of Missouri can definitely decide. State law has offered protections to unborn children in tort and probate law . . ., and Section 1.205.2 can be interpreted to do no more than that." *Id.* As discussed above, Missouri courts have decided to offer the protections of certain criminal and tort laws to unborn children, as assured by Section 1.205, and we adopt that interpretation here.

■ Defendant also argues that referring to Section 1.205 to interpret Section 565.021.1(2) violates Article III, Section 28 of the Missouri Constitution.[9] We dis-

---

7. We note that in *Connor*, no party raised a United States Constitution issue in regard to their own, or a derivative, constitutional right. 898 S.W.2d at 95 n. 8.

8. The court noted that House Bill 1596 contains three categories of statutes: Section 1.205, pertaining to the rights of unborn children and the finding that life begins at conception; Section 188.010, *et seq.*, pertaining to abortion regulation; and Section 565.024, pertaining to the criminal charge of involuntary manslaughter.

9. Article III, Section 28 provides:

No act shall be revived or reenacted unless it shall be set forth at length as if it were an original act. No act shall be amended by providing that words be stricken out or inserted, but the words to be stricken out, or the words to be inserted, or the words to be stricken out and those inserted in lieu thereof, together with the act or section amended, shall be set forth in full as amended.

agree.[10] Article III, Section 28 does not prohibit the general assembly from adopting rules of construction. *Connor*, 898 S.W.2d at 92. As stated above, Section 1.205 sets out a "canon of interpretation enacted by the general assembly." *Id.*[11] Thus, using the definition of a "person" in Section 1.205 to assist in interpreting Section 565.021.1(2) is not an amendment to the latter statute, and accordingly, not a violation of Article III, Section 28.

■ In summary, we hold that the provisions of Section 1.205, namely that an unborn child is to be considered a person, apply to define the term "person" in the felony murder in the second degree statute. Thus, under Section 565.021.1(2) and the circumstances of this case, causing the death of an unborn child is causing the death of a "person." The trial court did not err in denying Defendant's motion to dismiss Counts V and VI.

Further, sufficient evidence existed from which the jury might have found the defendant guilty beyond a reasonable doubt of felony murder in the second degree. The record established that the murder of Victim, committed during the robbery, also caused the death of her unborn child. Accordingly, Defendant's point one on appeal is denied.

In his second point on appeal, Defendant argues that the trial court plainly erred in failing to compel Williams to testify after Williams asserted his Fifth Amendment privilege against self-incrimination because testifying could not tend to incriminate Williams in that he already had pled guilty to the charged offenses. Defendant maintains that Williams' testimony would have supported Defendant's defense that he opposed the crimes committed.

■ Defendant concedes that he has not preserved this claim for appellate review because he did not object to Williams' assertion of the Fifth Amendment. However, Defendant requests that we review the claim for plain error.

A claim not properly preserved for appellate review may be considered for plain error at our discretion. Rule 30.20.[12] Under this standard, reversal requires a plain error affecting a substantial right that results in manifest injustice or miscarriage of justice. *Id.* Plain error review is to be used sparingly. *State v. Knese*, 985 S.W.2d 759, 770 (Mo. banc 1999). A defendant bears the burden of demonstrating manifest injustice or miscarriage of justice. *Id.* No manifest injustice or miscarriage of justice results when guilt is established by overwhelming evidence. *State v. Shaw*, 14 S.W.3d 77, 84 (Mo.App. E.D.1999).

■ The privilege against self-incrimination under the Fifth Amendment of the

**10.** We note that the *Knapp* court questioned whether or not Article III, Section 28 applies "absent clear language from Section 1.205, the amending statute, that words are to be inserted in or stricken from the statute(s) sought to be amended; i.e., it is uncertain whether Section 1.205 operates to change or amend other statutes in the limited manner specified by Article III, Section 28, because the amendatory language in Section 1.205 does not expressly provide that 'words be stricken out or inserted. . . .'" 843 S.W.2d at 350 n. 5.

**11.** In this regard, the *Connor* court compared Section 1.205 to other statutes enacted by the general assembly directing a particular rule of construction, such as Section 287.800, which mandates that our workers' compensation statutes be liberally construed. 898 S.W.2d at 92.

**12.** All rule references are to Mo. R.Crim. P.2003, unless otherwise indicated.

United States Constitution, made applicable to the states through the Fourteenth Amendment, states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Missouri's constitution has a similar provision. Mo. Const. art. I, sec. 19. A guilty plea waives the privilege as to the details of the crime to which the witness was convicted. *State v. Sanders,* 842 S.W.2d 170, 174 (Mo.App. E.D.1992).

The record indicates that Williams may have waived his privilege against self-incrimination. However, even if he did, we nonetheless find that the trial court did not plainly err in failing to compel Williams to testify because Defendant has not demonstrated that a manifest injustice or miscarriage of justice resulted from the failure. The record establishes Defendant's guilt by overwhelming evidence. Defendant's own statements revealed the following: Defendant planned the robbery with Williams. They decided they needed two cars so Defendant drove Williams to Williams' house to get the maroon car. They then returned to Defendant's apartment. Defendant went into his apartment to retrieve a handgun that he had borrowed from Williams two weeks earlier. Defendant gave the gun to Williams. They then left Defendant's apartment at about the same time and drove in separate cars to the store. Defendant entered the store, spoke with Victim, exited the store, looked at Williams and nodded to signal that Victim was there and that the robbery was still on. After seeing Williams shoot Victim and pick up the bag of money, Defendant drove to Williams' house, where Williams gave him about $5,000 from the robbery. Defendant then drove back to his apartment complex where he hid $4,000 in a drawer at his girlfriend's apartment

and about $1,200 in a sock in a closet at his apartment.

Further evidence of Defendant's guilt included: Defendant's presence at the scene, standing against his car watching the crimes with no expression, getting into his car and driving off as Victim fell to the ground. Money from the robbery and the same ammunition used in the murders were found hidden at Defendant's apartment and his girlfriend's apartment, to which he had a key. The same ammunition was found at Williams' house. On the day of the crimes, neighbors near Defendant's girlfriend's apartment saw Defendant come out of the apartment, get into a maroon car with no license plates and a temporary tag in the rear window where he spoke with a black male, and then return to the apartment, looking "excited and joyous." Later that evening, the police also saw Williams drive in the maroon car alongside Defendant's apartment, turn around and leave. Finally, Defendant told the police different versions of the day's events, indicating an attempt to hide his involvement in the crimes. The jury could reasonably infer from this evidence that at the least Defendant did not "oppose the crimes committed," Defendant's stated reason for wanting to call Williams to testify.

Therefore, Defendant has not met his burden of demonstrating manifest injustice or miscarriage of justice resulted in the trial court's failure to compel Williams to testify. Accordingly, the trial court did not plainly err in allowing Williams to assert his Fifth Amendment privilege against self-incrimination. Defendant's point two on appeal is denied.

*Conclusion*

The judgment of conviction and sentence

of the trial court is affirmed.[13]

KATHIANNE KNAUP CRANE and MARY K. HOFF, JJ., concur.

**13.** Defendant's Motion to Transfer Cause to Missouri Supreme Court, filed with this Court subsequent to Defendant filing his notice of appeal, is denied.